Stephen J. STAFFORD, and Brenda F. Stafford, Appellants, (Defendants below)

v.

BARNARD LUMBER COMPANY, INC., Appellee (Plaintiff below).

No. 34S02–8812–CV–959.

Supreme Court of Indiana.

Dec. 7, 1988.

Richard D. Martin, Miller & Martin, Frankfort, for appellants.

David R. Ball, Butcher, Ball & Lowry, Kokomo, for appellee.

PIVARNIK, Justice.

This cause comes to us on a petition to transfer from the Second District Court of Appeals of Indiana. Petition is brought by Barnard Lumber Company, Inc., Plaintiff below, and Appellee in the Court of Appeals.

Defendants–Appellants Stephen and Brenda Stafford appealed from a judgment in favor of Plaintiff–Appellee Barnard Lumber Company, Inc., awarding Barnard compensation for materials provided by them for the construction of a house on the Stafford's property.

The evidence most favorable to the judgment of the trial court shows that in the fall of 1983 Stephen Stafford contacted Bill Hogan, a contractor sales representative employed by Barnard, concerning salvaging a decayed floor package purchased by the Staffords from another lumber company. Stafford had begun to build a house on his property and had the floor package in place when he was forced to stop further construction because of financial problems. Exposure to the elements caused damage to the floor package and Stafford was interested in salvaging what he could of the floor package and proceeding with construction of a house. Hogan told Stafford that Barnard could sell the Staffords a new floor package at cost provided Barnard supplied all of the materials for the construction of their single family residence. During another conversation with Hogan, Stafford stated he wished to find a contractor who would be willing to take his present property in trade for construction of his new home and Hogan suggested Larry Cowell, a contractor, might be willing to make such an arrangement. Subsequently Stafford contracted with Cowell to construct the home and Barnard contracted with Cowell to furnish certain construction materials. The Staffords met with Hogan on several occasions to choose and order interior finishing, cabinets, door styles, and windows. Barnard delivered materials to the Stafford site from October, 1983 into March, 1984. The value of materials Barnard supplied was $39,779.35. Barnard's bills were directed to Cowell with copies sent to Stafford.

The Staffords paid Cowell $27,239.34 by December, 1983. Barnard received no payment for any of its materials. Hogan testified Stafford originally had a mortgage loan which he understood to provide that he would receive no payment until the project was finished. He confirmed the existence of the mortgage loan by calling the bank. Hogan testified Barnard was not aware Stafford, at the request of Cowell, subsequently refinanced and obtained a construction loan from another financial institution. The construction loan provided for partial payments to be made at various stages of completion of the project. When Barnard discovered partial payments had been made, he contacted Cowell for payment for materials supplied to Stafford. Cowell explained to him the money had already been disbursed to other subcontractors. Stafford then indicated to Hogan that problems had arisen with Cowell and the job had virtually been abandoned for the preceding two months. He told Hogan he was dissolving his contract with Cowell and was going ahead on his own to complete the project. Stafford also told Hogan he desired to continue to do business with Barnard and stated "he was not sure if there was going to be enough money left

from the construction loan to complete the project as indicated and if there was any unpaid balance could he make installments on that amount." Cowell eventually filed for bankruptcy. Stafford completed the project on his own by hiring additional laborers and material men. Some supplies previously delivered by Barnard were on the site but not yet built into the project. These supplies, including doors, trim, drywall, windows, and a spiral staircase, were then used by Stafford to complete the work. Barnard received no payments for any of the materials to the Stafford site.

 The trial court rendered a general finding in favor of Barnard and fixed damages in the sum of $39,779.35, together with prejudgment interest. The court of appeals properly found an appellate court is bound to affirm the trial court's decision on any theory before the trial court which is supported by the evidence, citing *Lawshe v. Glen Park Lumber Company* (1978), 176 Ind.App. 344, 375 N.E.2d 275. Barnard presented two theories of recovery in support of its contention the Staffords were obligated to pay. His complaint and opening statement indicate the theories before the court were based on mechanics lien law and unjust enrichment. Pursuant to Ind.R. P.Tr.R. 50 the Staffords moved for judgment on the evidence at the close of Barnard's presentation of evidence and the court granted the motion to the extent there was no valid mechanic's lien under I.C. 32-8-3-1. The trial court overruled Stafford's motion on the theories of unjust enrichment and I.C. 32-8-3-9, a mechanic's lien law section providing that a material man can obtain a personal judgment against the owner of the property. Thus the court of appeals or this court is bound to affirm the decision of the trial court if the evidence supports either of these theories. The court of appeals found there was no evidence to support either of these theories and reversed the trial court. We find the evidence supports the judgment of the trial court at least in part and accordingly vacate the memorandum opinion of the court of appeals. *Stafford v. Barnard Lumber Co., Inc.* (1986), Ind.App., 500 N.E.2d 1287, *reh. den.* 511 N.E.2d 519.

The court of appeals primarily relied on *Indianapolis Raceway Park, Inc., v. Curtiss* (1979), 179 Ind.App. 557, 386 N.E.2d 724, *trans. den.*, and *Lawshe,* 176 Ind.App. 344, 375 N.E.2d 275. The court of appeals found that although the theory of unjust enrichment was presented to the trial court and preserved as error for review in Stafford's motion to correct errors, there was no evidence to support recovery under the theory of unjust enrichment.

As the court of appeals points out in the instant case, *Indianapolis Raceway* set forth four criteria to evaluate whether the evidence supported the judgment under a theory of unjust enrichment: "whether the owner impliedly requested the subcontractor to do the work; whether the owner reasonably expected to pay the subcontractor, or the subcontractor reasonably expected to be paid by the owner; whether there was an actual wrong perpetrated by the owner; and whether the owner's conduct was so active and instrumental that the owner 'stepped into the shoes' of the contractor." *Stafford v. Barnard Lumber,* 500 N.E.2d 1287. The *Indianapolis Raceway* court properly found there was no evidence establishing any of these criteria supporting recovery for plaintiff Curtiss. The facts of that case demonstrate a typical arrangement and relationship among owner, general contractor, and the subcontractor who furnishes labor or materials at the general contractor's request and insistence. Indianapolis Raceway Park entered into a lease arrangement with a Mr. Heiman whereby Heiman agreed, in lieu of rent, to construct lighting for night races on the track owned by Indianapolis Raceway, and in return Heiman was given the right to promote races for one season. Curtiss had apparently worked with Heiman on prior occasions and Heiman asked Curtiss if he wanted to bid on the lighting project. Subsequently Curtiss submitted a proposal to Heiman, which he accepted. There was no contact whatever between Curtiss and Indianapolis Raceway. Indianapolis Raceway never received a copy of the proposal, although they were aware of

a ballpark figure for the total construction cost. When the time for payment arrived, Heiman wrote a bad check to Curtiss and Curtiss demanded payment by Indianapolis Raceway, eventually filing an action against them.

The court of appeals reversed judgment in favor of Curtiss, and found this arrangement was the typical situation where an owner contracts with another to perform certain construction and the other engages a subcontractor.

In such a case the parties have voluntarily allocated the risk by contract and the failure of the general contractor to perform does not generally give rise to an action for unjust enrichment against the owner.

*Indianapolis Raceway,* 386 N.E.2d at 726. The evidence clearly showed there was no relationship or contact between Indianapolis Raceway and Curtiss which could even remotely give rise to a finding that Indianapolis Raceway acted wrongfully or engaged in misleading conduct which resulted in unjust enrichment. Indianapolis Raceway had not requested Curtiss to do the work. Rather, Heiman dealt with Curtiss and entered into a binding contract with him to do the lighting project. There is no support for a finding that Indianapolis Raceway reasonably expected to pay Curtiss or that Curtiss reasonably expected to be paid by Indianapolis Raceway. Furthermore, Indianapolis Raceway did not take part in Heiman's or Curtiss' efforts in constructing the lighting to such extent that a finding Indianapolis Raceway "stepped into the shoes of" Heiman could be supported. This court denied transfer in *Indianapolis Raceway* and now finds that the *Indianapolis Raceway* court properly applied the law on this subject.

*Lawshe* is not in conflict with *Indianapolis Raceway* and presents facts very similar to those in the instant case. In *Lawshe,* John and Dorothy Lawshe contracted with Jack Ware for the construction of a single family residence upon the Lawshes' land. Ware, in turn, subcontracted with Glen Park wherein Glen Park was to provide certain construction materials in exchange for payments from Ware totalling approximately $6,000.00. Ware brought the project to partial completion and then, because of a dispute, was discharged. Most of the materials employed in bringing the house to that stage had been furnished by Plaintiff Glen Park. The Lawshes had made payments totalling $6,000.00 to Ware prior to his discharge but Glen Park received none of this. Subsequently, a representative of Glen Park spoke with John Lawshe and Lawshe told the representative he would see to it that the account was taken care of. The *Lawshe* court found that Glen Park construed Lawshe's statement as a personal promise to pay for the materials and, in reliance on that promise, forebore the filing of a mechanic's lien. Speaking for a unanimous court, Judge Staton held:

The basis for the doctrine of equitable estoppel is fraud, either actual or constructive, on the part of the person estopped. *Marcum v. Richmond Auto Parts Co.* (1971), 149 Ind.App. 120, 270 N.E.2d 884. Constructive fraud is fraud that arises by operation of law from conduct which, if sanctioned by the law, would secure an unconscionable advantage. *Hoosier Insurance Co. v. Ogle* (1971), 150 Ind.App. 590, 276 N.E.2d 876. Thus, in order to prevail on a theory of constructive fraud, one need not establish the existence of an actual intent to defraud. The result of the conduct triggers the application of the theory.

The mere nonperformance of an oral promise which falls within the scope of the Statute does not constitute such a fraud as would warrant the intervention of a court of equity. But, if one party is induced by another, on the faith of an oral promise, to place himself in a worse position than he would have been in had no promise been made, and if the party making the promise derives a benefit as a result of the promise, a constructive fraud exists which is subject to the trial court's equity jurisdiction. *Hurd v. Ball* (1957), 128 Ind.App. 278, 143 N.E.2d 458.

*Lawshe,* 375 N.E.2d at 278.

There are facts in the instant case which justify the trial court's application of the equitable doctrine of unjust enrichment as

to Stafford, at least to the extent of the materials delivered at the scene and not yet built into the house. Although testimony as to the Stafford's actual final completion costs figures is in conflict and somewhat confusing, it does appear there were materials Stafford used in his home after he took over the management of the construction. Those materials were valued in the neighborhood of $12,000.

█ It is not for this court, but rather for the trial court, to determine the evidentiary facts regarding the value of the materials. However, in applying the unjust enrichment equitable principle, we cannot say the trial court was unjustified in finding Barnard had a right to conclude he could look to Stafford for at least that amount. Unlike *Indianapolis Raceway* and *Lawshe*, Stafford dealt directly with Barnard, through Hogan, and made arrangements for a cost-plus trucking for the repair of the flooring package in exchange for Barnard's furnishing all of the materials for the construction of the home. Hogan helped Stafford find Cowell and recommended him as one who would do the job and take another property in trade. Hogan was led to believe the project would be financed through a mortgage loan in which payment would occur when the job was completed without periodic payments during its progress. He confirmed this with the financial institution which issued the mortgage. With this understanding he reasonably did not expect periodic payments and was not put on notice an obvious problem had arisen. Hogan did not realize until later the mortgage arrangement had been altered at Cowell's behest, and involved a different financial institution, and that monies had in fact been advanced to Cowell of which Barnard received none. At this point Hogan went to Cowell and attempted to collect the fee but was told the advances had been disbursed to other subcontractors. It was also at this point Hogan learned from Stafford that a serious problem had arisen with regard to Cowell, that the job had been virtually abandoned for two months, that Cowell was being discharged and Stafford was taking over the management and completion of the job.

Stafford then told Hogan that there might not be enough money left in the construction account to pay all the costs and asked if he could make installment payments to Barnard Lumber on the balance.

Setting up installment payments to pay the balance could reasonably be interpreted to mean that Stafford was able and planned to pay some but not all of the money due Barnard, and Stafford would be responsible for the balance and installment payments. Barnard took no steps to protect itself at this point by either filing a proper mechanic's lien notice or by attempting to retrieve the materials at the building site which had not been used in the structure. Stafford had in fact completed the project using Barnard's materials, and paid other laborers and material men for their services, but did not pay Barnard a penny. It is true, as the court of appeals stated, that Barnard well knew the manner in which construction jobs such as this are handled. It therefore could have expected to collect the money due from Cowell, the general contractor, after the money was distributed by Stafford, the owner. Since the breaches occurred after Barnard delivered the materials and during the time in which Barnard expected to collect from Cowell, it cannot reasonably be said that Barnard was led to believe Stafford was going to be personally responsible for Cowell's failure to pay for the materials up to the time the whole arrangement fell apart. Stafford was not unjustly enriched since he paid an amount over $27,000.00 which he reasonably expected to retire obligations to subcontractors, including Barnard.

Cowell caused the problems all of these parties experienced. After Cowell was no longer directly involved in the situation, the relationship between Barnard Lumber and Stafford changed. The arrangements Stafford and Barnard made prior to Cowell coming on the scene are significant in that they did give Barnard cause to feel there was some direct contractual relationship with Stafford and Barnard could rely on his word. Later then, Stafford told Barnard he was taking over the job, was going to complete it and expected to pay Barnard

for materials he furnished. Although he had already delivered the remaining materials to the site, they were not yet built into the structure and Barnard made no effort to prevent Stafford from later using them. Barnard reasonably expected Stafford to pay. Barnard certainly did not expect to be paid by Cowell, who had refused to pay and was completely out of the picture.

The evidence supports the fact that Stafford expected to pay Barnard since he expressly told Barnard he would do so. There is further evidence to support the contention Stafford had "stepped into the shoes of the contractor" since that is exactly what he did after telling Barnard he was going to do so. He discharged Cowell, took over the project, hired laborers and material men, and completed the project using the materials Barnard left at the building site and permitted him to use in the structure.

The court of appeals was correct in finding that pursuant to *Indianapolis Raceway,* and *Lawshe,* the evidence in this case does not justify a judgment in favor of Barnard Lumber for the entire $39,779.35, the cost of materials he furnished. The evidence does support the trial court's judgment to the extent it applies to materials Barnard furnished that had not been incorporated prior to the change in circumstances and assurances the Staffords made to Barnard. We therefore remand this cause to the trial court with instructions to set aside its judgment, determine the amount and value of materials Stafford incorporated into the structure after Cowell left the job, and enter judgment accordingly.

SHEPARD, C.J., and DeBRULER, and GIVAN, JJ., concur.

DICKSON, J., dissents and would deny transfer.